UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LADON DEMARCO CLOUD,

        Petitioner,           Case No. 1:05-cv-154

v.                                       Honorable Gordon J. Quist

MARY BERGHUIS,

        Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a prison term of 20 to 50 years, imposed by the Kent County Circuit Court on May 21, 2001, after a jury convicted him of attempted possession with intent to deliver over 650 grams of cocaine, MICH. COMP. LAWS § 333.7401(2)(a)(i), and conspiracy to possess with intent to deliver over 650 grams of cocaine, MICH. COMP. LAWS § 750.157a. In his *pro se* petition, Petitioner raises the following ground for habeas corpus relief:

> WAS THE DEFENDANT DENIED HIS RIGHT TO A FAIR TRIAL AND TO DUE PROCESS WHEN THE TRIAL COURT DRAFTED SPECIAL JURY INSTRUCTIONS WHICH INCLUDED CONFUSING, MISLEADING AND PREJUDICIAL EXAMPLES WHICH IN EFFECT TOOK FROM THE PROVINCE OF THE JURY THE ISSUE OF WHETHER THE DEFENDANT WAS GUILTY OF CONSPIRACY AND AN ATTEMPT TO POSSESS WITH THE INTENT TO DELIVER OVER 650 GRAMS OF COCAINE AND THUS IS ENTITLED TO A NEW TRIAL WITH PROPER INSTRUCTIONS?

Respondent filed an answer to the petition on September 6, 2005 (docket #12), and Petitioner filed a reply to the answer on October 11, 2005 (docket #33). Upon review and applying the AEDPA

standards, I find that Petitioner's claim is without merit. Accordingly, I recommend that the petition be denied.

## **Procedural History**

### **A. Trial Court Proceedings**

Petitioner and co-defendant Gregory Moore were charged with attempted possession with intent to deliver over 650 grams of cocaine and conspiracy to possess with intent to deliver over 650 grams of cocaine. Petitioner was tried before a jury on March 21 through 26, 2001. The prosecution maintained that because of a miscommunication between the surveillance officers and other officers involved in the operation, the other officers mistakenly stopped Petitioner and Moore's car before the drug transaction was completed. The prosecution maintained that Petitioner and Moore had gone beyond mere preparation and that the transaction would have occurred but for the premature police interception. The defense argued that Petitioner had abandoned the alleged criminal activity, and, thus, was not guilty.

Jaime Rodriguez (Rodriguez) testified that he met Petitioner through Rodriguez' brother, Omar. (Tr. II, 63-64.) Omar told Rodriguez that Petitioner wanted to make some cocaine purchases, and arranged for the three of them to meet on April 22, 2000. (Tr. II, 63- 64.) At the meeting, Petitioner asked Rodriguez if he could get him "a couple kilos" of cocaine. (Tr. II, 64.) Rodriguez told Petitioner that he did not usually handle that type of volume and that he would have to check with a couple of people. (Tr. II, 64.) After the meeting, Rodriguez called Detective Scott Malkewitz. (Tr. II, 66.)

Detective Scott Malkewitz testified that he was a detective with the Walker Police department, assigned to the Kent Narcotics Unit, a multi-jurisdictional drug enforcement task force.

(Tr. II, 31.) Malkewitz testified that he became involved with this investigation when he was contacted by an informant, Jamie Rodriguez. (Tr. II, 33.) The police tape recorded two phone conversations between Petitioner and Rodriguez on Monday, April 24, 2000. (Tr. II, 36-42.) The tapes of the phone calls were admitted into evidence and played for the jury. (Tr. II, 37-39, 41-42.) During the phone conversations, Petitioner agreed to meet Rodriguez at the *Beltline Bar* at 6:00 p.m. that evening. (Tr. II, 67.) Rodriguez told Petitioner that he needed to see the money first because "it was a lot of dope." (Tr. II, 68.)

Once the meeting was arranged, the police placed a body wire on Rodriguez and searched Rodriguez and his car to ensure that he was not in possession of any contraband. (Tr. II, 42.) Detective Malkewitz obtained two kilos of cocaine from the evidence vault to use in the transaction. (Tr. II, 44.) Police set up audio and video surveillance in the parking lot of the *Beltline Bar*. (Tr. II, 47, 119-20.) Rodriguez arrived in the parking lot first, followed by Petitioner, who was driving a Plymouth Sundance. While they were waiting for Moore, Rodriguez and Petitioner negotiated over a firm price for the cocaine. (Tr. III, 9.) At Malkewitz' instruction, Rodriguez quoted a price of $22,000 per kilo. Petitioner tried to negotiate Rodriguez down, but eventually agreed on the price of $22,000 per kilo. (Tr. III, 9.) Moore arrived in a blue Taurus. (Tr. II, 52, 70-71, 127-28.) Petitioner got into Moore's car and they showed Rodriguez two big plastic bags of money that were sitting in Moore's lap. (Tr. II, 71, 130.) After Rodriguez inspected the money for authenticity, he left the parking lot and met with Malkewitz. (Tr. II, 71.)

While Rodriguez was with Malkewitz, Petitioner called Rodriguez and wanted to change the location of the transaction to the *Lone Star* restaurant because there were too many people around the *Beltline Bar*. (Tr. II, 51, 71-72.) Just after they arrived at the *Lone Star*, some

employees came out of the back of the restaurant to smoke cigarettes. (Tr. II, 75.) As a result, Petitioner and Moore wanted to move to a park across the street. (Tr. II, 75.) Rodriguez was getting nervous and did not want to move again, but they told him to meet them in the park and drove out of the parking lot. (Tr. II, 53.)

Malkewitz testified that he could hear the conversation among Rodriguez, Petitioner and Moore through the body wire. (Tr. II, 51-52.) After the second location change to a more secluded location, Malkewitz and his supervisor, Detective Sergeant David Jones, became concerned that Petitioner and Moore may be planning to "rip off" Rodriguez. (Tr. II, 53; Tr. III, 54-55.) Jones instructed the officers to stop Rodriguez from leaving the *Lone Star* parking lot. (Tr. III, 56-57.) Some of the officers misinterpreted Jones' instructions and stopped Petitioner and Moore. (Tr. II, 53, 57.) Detective Harry Roelofs, a special agent with the Drug Enforcement Agency, stopped Moore's vehicle and took Petitioner and Moore into custody. (Tr. III, 65.) Police officers seized $52,000 in cash from Moore's car. (Tr. III, 16.)

Detective Patrick Frederick of the Kent County Sheriff's Department testified as an expert on the nature of drug trafficking in Kent County. (Tr. II, 110.) Frederick testified that a digital scale was found in Moore's trunk. (Tr. II, 28.) According to Frederick, digital scales were used by people in the drug trade to verify the weight of drugs that they purchased and to break large quantities of drugs down into small amounts for re-sale. (Tr. III, 28-29.) Four cell phones also were seized from Petitioner, Moore and Moore's car. (Tr. III, 29.) Frederick testified that drug traffickers typically used cell phones and pagers to conduct their business. (Tr. III, 30.) Frederick further opined that the purchase of two kilos of cocaine was indicative of a mid to high-level drug dealer. (Tr. III, 33.)

Detectives Frederick and Roelofs interviewed Petitioner after his arrest. Petitioner claimed that the money seized by police belonged to Moore. (Tr. III, 20.) Petitioner acknowledged that he had spoken to Rodriguez on April 22 about whether Rodriguez could get two kilos of cocaine and how much it would cost. (Tr. III, 20-21, 25.) Petitioner stated that he contacted Moore later that weekend to see if he was interested in buying some kilos of cocaine. (Tr. III, 22.) Petitioner told the detectives that he made contact with Rodriguez and told Rodriguez that he wanted two kilos of cocaine; one kilo for him and one kilo for Moore. (Tr. III, 23.) Petitioner admitted to having another phone conversation with Rodriguez during which they agreed to meet at the *Beltline Bar* to make the transaction. (Tr. III, 24.) Petitioner told the detectives that when Rodriguez left to get the cocaine, he and Moore decided to go somewhere else to complete the transaction because there were too many people in the *Beltline Bar* parking lot. (Tr. III, 25.) Petitioner indicated that he and Moore were ready to do the deal, but wanted to get to an area where they would not be observed. (Tr. III, 66.) When asked what he was going to do with the cocaine, Petitioner stated that he and Moore were going to sell the kilos themselves. (Tr. III, 28.)

Petitioner testified that at the time of the alleged offenses he was on medical disability from his job and had no money. (Tr. III, 92-93.) Petitioner denied that he intended to purchase cocaine. He stated that he met with Rodriguez on April 22 to buy a truck from Rodriguez' brother, Omar, and to buy some DVD players. (Tr. III, 93.) Omar bragged that Rodriguez had a lot of cocaine to sell and asked Rodriguez if he knew anyone who wanted to buy cocaine. (Tr. III, 98-99.) Petitioner testified that when he said in the phone to Rodriguez that he was going "half and half" he was talking about buying some tire rims from Rodriguez, and meant that he was going to buy one set of rims and Moore was going to buy another set. (Tr. III, 94.) Petitioner admitted that he set up a meeting between Rodriguez and Moore. (Tr. III, 122.) Petitioner further admitted that

- 5 -

he facilitated the deal in order to make some money. (Tr. III, 105-108, 122.) He testified that he went to the Beltline Bar to meet Rodriguez on April 24. (Tr. III, 95.) Petitioner claimed that he thought Rodriguez was just going to show Moore a sample, not to conduct a drug transaction. (Tr. III, 114.) Petitioner, however, admitted that Rodriguez gave him prices for the kilos of cocaine and that he passed that information along to Moore. (Tr. III, 104.) Petitioner also acknowledged that he was present when Moore showed the money to Rodriguez. (Tr. III, 121.)

Petitioner claims that while they were waiting in the first parking lot for Rodriguez to return with a sample Moore had a fight with his girlfriend over the phone and decided not to complete the deal. (Tr. III, 96.) According to Petitioner, he wanted to drive down to the Lone Star to see if a girl he knew still worked there. (Tr. III, 95.) Moore offered to give Petitioner a ride even though they both had their own cars. (Tr. III, 95, 112-13.) Petitioner claimed that it was Rodriguez' idea to go to the park, and that Petitioner didn't know where it was. Petitioner further testified that he told Rodriguez in the *Lone Star* parking lot that Moore changed his mind about the transaction. (Tr. III, 97-98.) At the time Petitioner claimed to have made the statement, two detectives were monitoring the wire that Rodriguez was wearing. Neither of the detectives heard Petitioner tell Rodriguez that the deal was off. (Tr. II, 61; Tr. III, 14.)

At the conclusion of trial on March 26, 2001, the jury found Petitioner guilty as charged of attempted possession with intent to deliver over 650 grams of cocaine and conspiracy to possess with intent to deliver over 650 grams of cocaine. (Tr. IV, 105-06.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on December 27, 2002, raised the same issue asserted in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #30.) By unpublished opinion issued on August 21, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 8/21/03 Mich. Ct. App. Opinion ("MCOA Op."), docket #30.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same claim raised in the Michigan Court of Appeals. By order entered February 27, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #31.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## **Discussion**

Petitioner claims that he was denied his right to due process and a fair trial when the trial court failed to use the standard jury instructions. Petitioner contends that the trial court should have read only the relevant Michigan Criminal Jury Instructions and that elaborating on the boilerplate language and injecting examples and comparisons led to confusing, misleading and prejudicial jury instructions. Specifically, Petitioner claims that the trial court's examples took away from the province of the jury whether abandonment occurred in this case.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). "It must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some constitutional

right." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). The challenged instruction may not be judged in isolation, but must be considered in the context of the instructions as a whole. *Id.*

In addressing Petitioner's claim on appeal, the Michigan Court of Appeals first noted that trial courts are encouraged to use the standard jury instructions as a reference tool, but are not required to follow them verbatim. The court of appeals explained:

> [W]e conclude that Cloud's argument that the trial court erred by not following the standard criminal jury instructions has no merit. The law makes clear that substance prevails over form when it comes to effective jury instructions. Simple logic and common sense dictate that there will be legal principles that arise in any trial which require some explanation, exemplification and elaboration for a jury's benefit. Therefore, regardless of the manner in which the instructions are given, as long as the instructions include all the elements of the crime charged and consider all material issues, defenses, and theories for which there is evidence in support, reversal is not required.

(MCOA Op., 3.) The Michigan Court of Appeals further found that Petitioner was not prejudiced by the trial court's instructions in this case:

> The crux of Cloud's argument is that he was unfairly prejudiced by misleading and confusing jury instructions. Cloud argues this point by repeatedly comparing the trial court's jury instructions to the standard criminal jury instructions. For instance, Cloud points to the instruction on the charge of conspiracy as being misleading and confusing. However, Cloud never analyzes the transcript of the conspiracy instruction to support his conclusion that the instruction was misleading. Rather, Cloud recites the standard criminal jury instruction for conspiracy, including the elements of agreement and membership, and then simply quotes eleven pages from the transcript, highlighting part of the instruction regarding specific intent.
>
> Cloud takes a similar approach for his claim that the specific intent, attempt and abandonment instructions were misleading and confusing. Cloud again cites the standard criminal jury instructions for specific intent, attempt and abandonment, and then quotes at length from the trial court's instructions, highlighting various sections where the trial court provided examples to demonstrate a legal principle. Cloud then concludes that providing an example of what constitutes mere preparation for attempt was highly improper. Again, Cloud provides no analysis of the instructions to make these conclusions. An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims. In any event, based

on the entirety of the instructions given, the trial court fairly presented the issues to be tried and sufficiently protected Cloud's rights.

The trial court initially instructed the jury on the crime of conspiracy and the agreement element that is required between two or more persons. The trial court then elaborated on the agreement aspect of a conspiracy by instructing the jury that the agreement must be intending and expressing the same purpose but that no formal agreement is necessary. The trial court made clear that the agreement between the parties must have been to accomplish the crime with which they were charged:

> In this particular case though, we're not dealing with an allegation to commit some crime. There is an allegation to commit a specific crime. And that is that there was an agreement or mutual understanding to acquire for purposes of later distribution 650 or more grams of cocaine. Therefore, the evidence at this trial has got to prove to you that that was the objective of the agreement or understanding between Mr. Cloud and Mr. Moore. I'm going to give you some alternatives dealing with lesser amounts in a moment. But the basic thing here is that the claim was there was an agreement or understanding to acquire for later distribution a quantity of cocaine.

The trial court also instructed that the evidence presented, when applied to the elements of conspiracy, must show beyond a reasonable doubt that Cloud had an agreement to acquire and distribute 650 grams of cocaine. Finally, the trial court summarized the specific intent requirement by stating:

> What the evidence must establish is that Mr. Cloud knew the object of the conspiracy and that he deliberately became a party to it intending to help effectuate that object. It's not significant whether he intended to play a big part, a small part, so long as he intended to play a part and intended for the end result to be the acquisition by him, or by Mr. Moore, or by both of them, of cocaine for purposes of delivering it.

The trial court next instructed the jury regarding the issue of accomplice liability and the intent requirements for attempt:

> If you help someone purely by accident, you don't mean to help them just so happens that coincidently you do something which helps, clearly, you're not guilty of anything. If, on the other hand, you help somebody meaning to help somebody to commit a crime, then you are an [accomplice]. And under Michigan law an [accomplice] is just as guilty of the crime as the person who actually commits it.

- 11 -

Following the accomplice instructions, the trial court then explained the concept of going beyond "mere preparation" for an attempt crime. The trial court used three examples of going beyond mere preparation that Cloud now claims were highly improper and favored the prosecution's evidence. The trial court initially prefaced the examples given by stating:

> Mr. Cloud's actions must go beyond mere preparation to the point where the crime would have been completed, in all likelihood, if it had not been interrupted by outside circumstances. Let me give you an example here, an example that deals with a completely different crime. *And I use a completely different one so nobody can misread the example as a suggestion as to how you should decide this case.* [Emphasis added.]

The trial court then illustrated the legal principle of mere preparation by introducing a hypothetical where a person plotting a murder thinks of various ways to commit the crime and even "scopes out" a location ahead of time, but is arrested the morning before he actually takes up the position to kill his victim. The trial court used a variation on this example to show going *beyond* mere preparation by having the hypothetical killer going to the spot where he decided the murder would take place and doing everything but squeezing the trigger before the police, who were watching him, moved in and interrupted him. Finally the trial court demonstrated an attempted crime by giving an example where a pickpocket intends to take a wallet, but there is no wallet in the pocket of his victim.

Cloud argues that the trial court's examples took away from the province of the jury the issue of whether he had the necessary requisite intent needed to convict and whether his actions went beyond mere preparation. However, Cloud never supports this conclusion with analysis. He merely asserts that the instructions given were misleading and confusing compared with the standard instructions. Thus, under Cloud's approach *any* deviation from a verbatim account of the standard criminal jury instructions is confusing and misleading. We observe, again, that there is simply no analysis of how the instructions given could have misled or unfairly prejudiced the jury. Rather, Cloud announces his position and then leaves it to this Court to discover and rationalize the basis for his claims.

We conclude, in any event, that the trial court's examples were not misleading, prejudicial or confusing. On the contrary, the examples provided cogent illustrations of a difficult legal principle. Therefore, we conclude that the jury instructions in this case fairly presented the issues to be decided and sufficiently protected Cloud's rights at trial. The trial court informed the jury as to all the elements of the crimes charged and theories for which there was evidence in support. Further, despite the length of the instructions given or the apparent deviation from the boilerplate language contained in the standard criminal jury instructions, because

>the elements of each offense were provided in a clear and intelligent manner, the trial court successfully provided the instructions.

(MCOA Op. 3-6) (citations omitted).

Judged under due-process standards, Petitioner's challenges to the jury instructions cannot be sustained. The Michigan Court of Appeals found no error with regard to the jury instructions, much less any error or errors that deprived Petitioner of a fundamentally fair trial. Upon review of the jury instructions (Tr. IV, 36-94), I agree with the state court's assessment. Petitioner has not cited any Supreme Court or other federal authority requiring a trial court to use standard jury instructions or prohibiting trial courts from providing the jury with illustrations or examples as a means of explaining the elements of the charged offenses. As explained above by the Michigan Court of Appeals, the trial court took care to use examples that were completely unrelated to drug transactions. For instance, in explaining what constitutes an "attempt" to commit a crime, the trial court used an example of a person who attempts to commit a murder, but gets arrested by police before he can pull the trigger. (Tr. IV, 75-77.) Moreover, it is clear from the record that the trial court thoroughly instructed the jury as to all of the elements of the charged offenses. The trial court also instructed the jury on the defense of abandonment. (Tr. IV, 81-83.) Petitioner, therefore, cannot show that he was denied a fair trial as a result of the jury instructions.

I find nothing to suggest petitioner was denied due process, *see Henderson v. Kobbe, supra,* at 155 and *Estelle v. McGuire, supra,* at 75, or that the decision of the state court either resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, or resulted in a decision that was based upon an unreasonable determination of facts in light of the evidence presented in the state

court proceeding. 28 U.S.C. § 2254(d). Consequently, petitioner is not entitled to habeas corpus relief.

### **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  January 12, 2007              /s/ Hugh W. Brenneman, Jr.
                                      Hugh W. Brenneman, Jr.
                                      United States Magistrate Judge


### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).